IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| J.W. and M.R.W., individually and as parents, guardians and next friends of A.W. f/k/a A.M., a minor child and M.W. f/k/a/ K.C., a minor child,<br><br>                    Plaintiffs,<br><br><br><br><br>     vs.<br><br><br><br>STATE OF UTAH, et al.,<br><br>                    Defendants. | ORDER and MEMORANDUM DECISION<br><br><br><br><br><br><br>Case No. 2:05-CV-968 CW |

In this action, Plaintiffs, the W family, JW ("Mr. W"), MRW ("Mrs. W"), AW and MW, have sued various Defendants for, among other things, violating the Ws' civil rights under 42 U.S.C. § 1983. In brief, the Ws allege that Defendants placed a foster child, WCC, in their home and that WCC abused AW, causing AW extensive psychological damage.[1] The Ws contend that the moving Defendants acted wrongly in placing WCC in their home because the Defendants should have known that WCC was a risk to AW and because they did not inform Mr. and Mrs. W of that fact.

Now before the court is a motion for partial summary judgment brought by Carolyn Hansen, Kolyn Tacy and Laurie Zumbrunnen. (Dkt. No. 96.) At the times relevant to this action,

---

[1] Because this case involves confidential and sensitive information concerning the Ws and WCC, the court has sealed records pertaining to them and has ordered that their full names not be used. (See Dkt. No. 38.)

Ms. Tacy was a case worker with the Utah Department of Child and Family Services ("DCFS"), Ms. Hansen was Ms. Tacy's supervisor and Ms. Zumbrunnen worked for DCFS as an advocate for foster parents. Ms. Hansen, Ms. Tacy and Ms. Zumbrunnen each claim that they are entitled to qualified immunity, entitling them to judgment in their favor on the Ws' § 1983 claims against them. For the reasons discussed below, the court GRANTS the motion with respect to Ms. Zumbrunnen and Ms. Hansen and DENIES the motion with respect to Ms. Tacy.

## BACKGROUND

Mr. and Mrs. W signed up as foster parents with DCFS with the intention of adopting children who would first live with them as foster children. In July/August 2002, Mr. and Mrs. W were in the process of adopting AW, then a five year old girl who was living with them as a foster child. AW was born into extremely difficult circumstances, with both of her biological parents involved in substance abuse and trouble with the law. By the time DCFS removed AW from her home, she had been severely neglected and abused, with serious physical and mental health problems as a result. Six months after DCFS removed AW from her biological parents, in October 2001, AW was placed with Mr. and Mrs. W. At that time, AW's therapist noted that AW's mental health was improving and suggested that her environment continue to be supportive and free from violence. Several months after AW was placed with Mr. and Mrs. W, Ms. Tacy became AW's caseworker. In April 2002, another mental health evaluation showed that AW was making continued improvement and showed no significant psychopathology.

On July 31 or August 1, 2002, Ms. Tacy approached Mr. and Mrs. W about accepting WCC and MW as foster children. At that time, MW was a newborn girl and WCC, MW's brother, was a six year old boy. Ms. Tacy had been working as WCC's caseworker since about November, 2001. The Ws allege that Ms. Tacy told them that if they were interested in fostering

2

and possibly adopting MW, they would also need to accept WCC as a foster child. At that time, WCC was living in another foster home with two biological siblings and another foster child.

According to the Ws, in their initial conversation about WCC, Ms. Tacy told them only that WCC lied a lot and was on medication for ADHD, but was otherwise a sweet kid. The Ws do not recall Ms. Tacy informing them about any other potentially problematic behaviors that WCC had displayed or other facts about him. The Ws met WCC for the first time on August 13, 2002. At about that time, Ms. Tacy related to the Ws that WCC had made some racist comments to and had some jealousy issues with the non-sibling foster child living in WCC's foster home. The Ws aver that Ms. Tacy did not tell them about behavioral issues or any other past or potential problems concerning WCC at that time either.

Like AW, WCC was born into tragic circumstances, with his biological mother involved in drugs and the criminal justice system. By the time Ms. Tacy sought to place him with the Ws, WCC had been in three foster homes and was living an a residence for children under DCFS' care. The portions of WCC's Activity Record submitted by the parties reflect multiple instances of problematic and troubling behaviors. For example, the records contain various instances of WCC acting out against a foster child in his previous foster home, including shoving and taunting the child. There are also records of allegations that WCC was the victim of sexual abuse and that he had engaged in some behaviors that appeared sexually reactive to the foster parents prior to the Ws. For her part, Ms. Tacy responds that the allegations of sex abuse were not substantiated and that she did not believe that the foster parents were correct in their belief that WCC's actions were sexual in nature.

There is at least an issue of fact of whether Ms. Tacy failed to report many particular behaviors by or other potentially relevant facts about WCC to the Ws. Moreover, Ms. Tacy

3

acknowledges that she does not recall reading every entry in WCC's Activity Record prior to suggesting that the Ws take him as a foster child.  Ms. Tacy has testified, however, that she did not believe that WCC had any tendency to be a sexual abuser.  Moreover, Ms. Tacy believed that some of WCC's behaviors might have been considered normal for WCC, even if they were not normal in other children.

On August 26, 2002, WCC moved in to the Ws' home.  WCC almost immediately began to act out.  Soon after he arrived, WCC slapped AW.  On August 29, 2002, WCC told AW that he had a cartoon character girlfriend that he was going to have sex with.  On about August 30, 2002, WCC asked to see AW's nipples, then unbuttoned her shirt and touched them.  WCC threatened AW that he would hurt her if she told Mr. and Mrs. W about the incident.  On September 5, 2002, the Ws' adoption of AW was finalized.  According to the Ws, for the next several months, WCC continued to act violently toward AW, including physical and sexual violence against her.  In about November, 2002, WCC was placed in a residential treatment program and removed from the Ws' home for good.  In the period after WCC was placed in her home, and even up to the time of the briefing on this motion, AW's mental health deteriorated and has continued to deteriorate.  The Ws' expert links AW's psychological problems with the abuse she suffered at the hands of WCC.

In late 2005, the Ws initiated this action in Utah state court.  The Defendants removed to this court, citing federal question jurisdiction.  In their amended complaint, the Ws allege various claims against multiple Defendants.  Relevant here are the Ws' § 1983 claims against the moving Defendants, which are brought under the Fourth, Fifth, Eighth and Fourteenth Amendments.  As mentioned, these claims are generally based on the decision to place WCC in the Ws' home and on the failure to inform Mr. and Mrs. W of certain information about WCC.  Ms. Zumbrunnen,

Ms. Hansen and Ms. Tacy have moved for partial summary judgment in their favor on those claims, citing qualified immunity.

## ANALYSIS

### I.      Summary Judgment Standards

"Summary judgment is proper if the evidence submitted by the parties, viewed in the light most favorable to the non-movant, indicates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." <u>Faustin v. City & County of Denver, Colo.</u>, 423 F.3d 1192, 1198 (10th Cir. 2005) (citations and internal quotation marks omitted). <u>See also</u> Fed R. Civ. P. 56(c). "A 'material fact' is one which could have an impact on the outcome of the lawsuit, while a 'genuine issue' of such a material fact exists if a rational jury could find in favor of the non-moving party based on the evidence presented." <u>Chasteen v. UNISIA JECS Corp.</u>, 216 F.3d 1212, 1216 (10th Cir. 2000). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where, as here, a defendant invokes the qualified immunity defense on summary judgment, "the burden shifts to the plaintiff to meet a strict two-part test." <u>Cassady v. Goering</u>, 567 F.3d 628, 634 (10th Cir. 2009) (citations omitted). First, a plaintiff must present facts supporting the conclusion "that the defendant violated a constitutional or statutory right." <u>Id.</u> (citation omitted). Second, a plaintiff must show "that this right was clearly established at the time of the defendant's conduct." <u>Id.</u> (citation omitted). The court has discretion to consider these questions in the order which best applies to the case at hand. <u>See</u> <u>Pearson v. Callahan</u>, 129 S. Ct. 808, 818 (2009) (allowing courts discretion to decide in which order to address the two

parts of the qualified immunity inquiry).  If a plaintiff does not carry this burden, the a grant of qualified immunity is appropriate.

The Ws concede that the facts of this case do no support claims under the Fourth, Fifth or Eighth Amendments against the moving Defendants.  Accordingly, the argument has focused on whether these Defendants violated AW's Fourteenth Amendment rights.

## II.    The Ws' Fourteenth Amendment Claim

### A.    Was there a Well Established Right?

Here, it is most efficient to consider the second question of qualified immunity test first. That is, have the Ws shown that there was a well established right is at issue in this case at the time of the alleged misconduct?  The court believes that they have.  Namely, it is clear that at the time WCC was placed with the Ws, the Fourteenth Amendment granted AW the right to be kept safe while she was a foster child in the DCFS system.[2]  This right has been expressly recognized since at least 1992, when the Tenth Circuit unequivocally held that "children in the custody of a state [have] a constitutional right to be reasonably safe from harm." Yvonne L. v. New Mexico Dep't of Human Servs., 959 F.2d 883, 893 (10th Cir. 1992).  See also Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142-43 (10th Cir. 2006) (same).  This duty arises because, when the state takes custody of a child, a "special relationship" arises between the child and the state, which triggers an affirmative duty to protect the child.  Johnson, 455 F.3d at 1142-43.[3]

---

[2] The Ws assert in their amended complaint that the moving Defendants also owed a duty to MW, but do not point to any evidence in their opposition that supports a conclusion that this duty was breached the moving Defendants.

[3] The Ws also contend that the moving Defendants continued to have a special relationship with AW after Mr. and Mrs. W adopted her on September 5, 2002, giving the Defendants a duty to protect her even after that date.  While this proposition is not illogical, the Ws have cited no authority supporting it, and it is clear that " state officials are generally not

It is worth noting that in reaching this conclusion, the court agrees with the Ws that their claim is not primarily based on a failure to provide Mr. and Mrs. W with information about WCC. Rather, the court has focused on the Defendants' duty to AW in making the decision to place WCC in the same home as AW. In any event, Defendants' argument that foster parents never have a constitutional right to information about foster children is based on Defendants' overly ambitious reading of a federal district court case, Reed v. Knox County Dep't of Human Servs., 968 F. Supp. 1212 (S.D. Ohio, 1997). The court views Reed as standing for the more limited proposition that a failure to provide foster parents with information about foster children who then victimize the foster parent's children does not support a § 1983 claim. See id. Here, the Ws claim that the failure of the moving Defendants to provide them with information about WCC facilitated WCC harming AW, who was in DCFS's protection until September 5, 2002. The difference between the facts here and those in Reed make Reed inapplicable to this case.

**B.     Did the Ws Provide Proof of a Rights Violation?**

Having decided that there is a well established right at issue here, the question becomes whether the Ws have presented facts suggesting that the Defendants violated AW's rights. To do so, the Ws must present evidence that the particular Defendant knew of danger to AW or "failed to exercise professional judgment" with respect to a potential danger to AW. Yvonne L., 959 F.2d at 893-94. In explaining what constitutes a failure of professional judgment, the Tenth Circuit has clarified that it "does not mean mere negligence. . .; while it does not require actual knowledge the child[] will be harmed it implies abdication of the duty to act professionally in

---

responsible for the actions of third parties under the substantive component of the Due Process Clause." Johnson, 455 F.3d at 1142 (citation omitted). Accordingly, the court declines to find that there was a constitutional duty to AW after she was adopted. It is also worth noting that the Ws have not relied on a "danger creation" theory.

making the placements." Id. at 894. "Such abdication must be sufficient to shock the conscience." Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1143 (10th Cir. 2006) (citation omitted). Moreover, for a supervisor to be liable for a constitutional violation of a foster child's rights that resulted from a supervisee's actions, there must be facts showing that "the supervisor actually participate[d] in or personally direct[ed] the deprivation or ha[d] actual knowledge of the deprivation and acquiesce[d]." Bailey v. Pacheco, 108 F.Supp. 2d 1214, 1221 (D.N.M. 2000) (internal quotation marks and citations omitted).

The Tenth Circuit's decision in Johnson illustrates the considerations that courts should make in deciding whether a social worker has abdicated the professional duty to keep a foster child safe. In Johnson, the plaintiff was the estate of a girl who had been placed in foster care was later adopted by her foster mother, and was then was abused to death by the foster/adoptive mother. 455 F.3d at 1135. Before the girl was adopted, the state child protection agency had investigated allegations of abuse of the girl by the foster mother and found them to be unsubstantiated. Id. at 1137. Among other claims, the estate brought § 1983 claims against two social workers involved in the girl's placement in the home and investigating the abuse allegations. Id. at 1135. The district court granted summary judgment in favor of the social workers on those claims on the basis of qualified immunity, and the estate appealed. Id. After reviewing the facts of the case, the court upheld the grant of immunity to one worker, and reversed as to the other, a Ms. Villareal. Id.

Most relevant here is the court's reasoning in overturning the grant of qualified immunity to Ms. Villareal. First, the court noted that the girl had a Fourteenth Amendment right to be kept safe while she was a foster child in the state's care. Id. at 1143-43. The court then went on to consider whether there were any facts indicating that Ms. Villareal had abdicated her professional

judgment in keeping the girl safe.  The court found that Ms. Villareal had done so.  Specifically, the court noted that at some point, Ms. Villareal, who was previously supervising the girl's case worker, herself became solely responsible for the girl's case.  Id. at 1145.  The court noted that after Ms. Villareal became the girl's caseworker, the foster mother removed the girl from day care and fired the girl's home nurses.  Id.  (The girl suffered from spina bifida.  Id. at 1134.)  Moreover, the foster mother's father also moved into the house, a fact that the foster mother did not tell the agency.  Id. at 1145.  During the entire two-month period in which all of these events were occurring in the girl's life, Ms. Villareal "did not investigate any of these circumstances and. . . did not make a single visit to [the foster mother's] house or inquire into these matters."  Id.  The estate's expert witness opined that these failures were an "abandonment of professional judgment" by Ms. Villareal.  Id.  Accordingly, the question of whether Ms. Villareal "exercised professional judgment in concluding that the events were not of concern is a disputed question of material fact and is inappropriate for resolution on summary judgment."  Id.  The court however, refused to find that Ms. Villareal had abdicated her duty on any other proposed grounds.  Id. at 1144.

Considering the Tenth Circuit's analysis in Johnson, the court finds persuasive the district court's view of the professional judgment standard as set out in Bailey, 108 F.Supp. 2d at 1220-1221.  In discussing the professional judgment inquiry, the Bailey court explained that when a court is deciding whether there has been "a substantial departure from accepted professional judgment, practice or standards:"

> [T]he question to be determined is "only whether professional judgment was in fact exercised; it is not appropriate for the Court to determine 'which of several professionally acceptable choices should have been made.'"  Clearly, professional judgment "may be exercised differently by different professionals[;] the [C]ourt is not to attempt to second-guess professionals in their decision-making."

Id. at 1221 (citations omitted).

With this standard in mind, the court evaluates the second part of the test as to the moving Defendants. The Ws do not argue that the Defendants knew with certainty that WCC was going to harm AW, especially in a sexual manner, nor does the court see any evidence to support such an argument. Rather, the Ws argue that these Defendants abdicated their duty to exercise professional judgment by failing to anticipate that placing WCC with the Ws might harm AW and by not giving Mr. and Mrs. W more information about WCC that may have enabled Mr. and Mrs. W to help prevent harm to AW. The court will address these arguments as to each Defendant below.

### 1. Ms. Zumbrunnen

As noted above, the evidence here is that Ms. Zumbrunnen worked as an advocate for foster parents in the DCFS system. It is undisputed that Ms. Zumbrunnen played no role in the decision to place WCC in the Ws' home. Nor is there any dispute that Ms. Zumbrunnen did not have any information about WCC until after the decision had been made to place him with the Ws. In sum, there is no evidence that Ms. Zumbrunnen took any actions that even arguably violated AW's rights. Accordingly, Ms. Zumbrunnen is entitled to qualified immunity. See Johnson, 455 F.3d at 1143.

### 2. Ms. Hansen

Beyond the Ws' expert's conclusory statement otherwise, there is no basis for a fact finder to conclude that Ms. Hansen had any duty to know of WCC's problems, to assess whether he was a risk to AW, or to inform Mr. and Mrs. W of any information about WCC. Rather, the evidence is that Ms. Hansen's role in this case was to supervise Ms. Tacy. It was Ms. Tacy, not Ms. Hansen, who worked as the primary case worker on AW and WCC's files and who was the

primary point of contact with Mr. and Mrs. W. And there is no evidence that Ms. Hansen played a role in the decision to place WCC with the Ws beyond that of supervising Ms. Tacy.

Considered in this light, it appears that the claim against Ms. Hansen comes down to one for deficient supervision, which by itself does not support a § 1983 claim. See Bailey, 108 F.Supp. 2d at 1221. Rather, to make a successful claim against Ms. Hansen as supervisor in this situation, the Ws must show that she actually participated in or directed the deprivation, or that she had actual knowledge of the depravation and acquiesced. See id. But the Ws have presented no evidence to support any such conclusions as to Ms. Hansen. Accordingly, Ms. Hansen is entitled to qualified immunity.

### 3. Ms. Tacy

Ms. Tacy is in a different category than the other Defendants because it is clear that she was responsible for placing WCC with the Ws and for relaying information to Mr. and Mrs. W. The Ws' two bases for arguing that Ms. Hansen should be denied qualified immunity boil down to these: that Ms. Tacy should have recognized that WCC was prone to physical and sexual violence, and that Ms. Tacy should have given more information to Mr. and Mrs. W about WCC before he was placed in their home. Ms. Tacy's arguments that she is immune can be distilled to these: that she knew WCC very well, that she believed that his behaviors were normal for him, and that she did not think that he was a risk to be a sexual perpetrator.

Each side has made their arguments based on these positions, and the court has given them due consideration. But after struggling with this question, the court has determined that neither side has correctly framed the core issue here. Simply put, the dispositive question in determining whether Ms. Tacy is protected by qualified immunity is whether she fulfilled her duty to use her professional judgment in keeping AW safe. As in Johnson, this duty clearly

extends to giving consideration to the potential impact of a major change in AW's life: here, the potential placement of WCC in AW's home. After all, AW came from a neglectful and abusive background, and it is clear even to a lay person that placing another child who exhibited troubling behaviors in her home posed a possible risk to her.

Ms. Tacy misses the mark in arguing that after her extensive experience with WCC, she believed that WCC's behavior was within a normal range for him and that she did not believe that WCC was a risk to be a sex abuser. While these determinations may well be the result of Ms. Tacy using professional judgment, they only cover one side of the equation. That is, even if WCC's behaviors were something that were normal for him or even something that most children could adjust to, the question Ms. Tacy had to ask was whether AW in particular would be at risk from those behaviors. Likewise, WCC could have posed a threat to AW even if he was not prone to sexual violence. After a thorough review, the court finds that the record as it relates to this motion is completely devoid of any evidence that Ms. Tacy considered the specific question of whether it was safe for AW to place WCC in her home.

The quality and amount of information Ms. Tacy gave Mr. and Mrs. W about WCC is a subset of the larger question of Ms. Tacy's consideration of AW's safety. That is, the salient question is not whether Ms. Tacy filled the letter of DCFS policy and contract when she spoke to Mr. and Mrs. W about WCC before he was placed in their home. Rather, the inquiry is whether Ms. Tacy considered AW's safety in deciding what information to give Mr. and Mrs. W about WCC. And Ms. Tacy has not pointed to any evidence that she thought about that question in that context.

To sum up, the Ws have presented undisputed evidence that placing WCC with the Ws presented a potential risk to AW. Ms. Tacy has not countered this showing with any proof that

she specifically considered that risk, either in her decision to place WCC in AW's home, or in deciding what to tell Mr. and Mrs. W about WCC before the placement. Accordingly, Ms. Tacy is not entitled to qualified immunity at this time.[4]

## ORDER

For the reasons stated above, the court GRANTS the motion for partial summary judgment as brought by Ms. Zumbrunnen and Ms. Hansen and DENIES the motion as brought by Ms. Tacy.

SO ORDERED this 3rd day of September, 2009.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[4] Of course, the court does not find here that Ms. Tacy did not consider the risk to AW, but merely points out that in relation to the present motion, Ms. Tacy has not shown evidence that she did so.